1

<pre>
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF WASHINGTON
 2
   UNITED STATES OF AMERICA,        ) Case No.
 3                                  ) 4:19-cr-06063-SMJ-01
                        Plaintiff,  )
 4                                  ) January 9, 2020
   v.                               ) Richland, Washington
 5                                  )
   MONICA PESINA, (01),             ) Contested Motion Hearing
 6                                  )
                        Defendant.  ) Pages 1 to 56
 7  _____)

 8
                 BEFORE THE HONORABLE SALVADOR MENDOZA, JR.
 9                  UNITED STATES DISTRICT COURT JUDGE

10
                             APPEARANCES:
11
   For the Plaintiff:            Stephanie A. Van Marter
12                               Stephanie.Van Marter@usdoj.gov
                                 US Attorney's Office-SPO
13                               920 W Riverside, Suite 300
                                 P.O. Box 1494
14                               Spokane, WA 99210
                                 509-353-2767
15
   For the Defendant:            Adam R. Pechtel
16                               Adam@pechtellaw.com
                                 Pechtel Law, PLLC
17                               21 N. Cascade Street
                                 Kennewick, WA 99336
18                               509-586-3091

19

20  Official Court Reporter:     Kimberly J. Allen, CCR #2758
                                 United States District Courthouse
21                               P.O. Box 685
                                 Richland, Washington 99352
22                               (509) 943-8175

23  Proceedings reported by mechanical stenography; transcript
    produced by computer-aided transcription.
24

25
</pre>

2

1                              **INDEX**

2                         **WITNESS INDEX**

3    **Plaintiff Witness:**                          **Page**

4

5      None

6                              *****

7    **Defense Witnesses:**                          **Page**

8

9

10     **DEEANN GOODRICH**
              Direct Examination By Mr. Pechtel      30
11            Cross-Examination By Ms. Van Marter     34
              Redirect Examination By Mr. Pechtel     40
12     **LENA SAMORANO**
              Direct Examination By Mr. Pechtel       5
13            Cross-Examination By Ms. Van Marter     12
              Redirect Examination By Mr. Pechtel     27
14

15                      **EXHIBITS ADMITTED**

16   **Plaintiff**
17     **Number**        **Description**              **Page**

18                    None

19
     **Defense**
20     **Number**        **Description**              **Page**

21                    None

22                       **GENERAL INDEX**

23

24                                                  **Page**

25     Reporter's Certificate............................56

1    (January 9, 2020; 1:48 p.m.)

2              THE COURTROOM DEPUTY:  Please rise.

3         (Call to Order of the Court.)

4              THE COURT:  Please be seated.

01:48:10  5              THE COURTROOM DEPUTY:  Matter before the Court is *United*

6    *States v. Monica Pesina*, Cause No. 4:19-cr-06063-SMJ-1.  Time

7    set for a motion hearing.

8              Counsel, please state your presence for the Court and

9    record.

01:48:23  10             MS. VAN MARTER:  Stephanie Van Marter and Task Force

11   Officer Brazeau present.  Good afternoon.

12             THE COURT:  Good afternoon.

13             MR. PECHTEL:  Good afternoon, Your Honor.  Adam Pechtel

14   on behalf of the defendant, Monica Pesina, who is present and in

01:48:35  15   custody.

16             THE COURT:  Good afternoon to both of you.

17             Counsel, sorry for the late start.  I understand this is

18   a motion by the defendant.

19             Mr. Pechtel, are there any preliminary comments you'd

01:48:48  20   like to make?

21             MR. PECHTEL:  Yes, Your Honor.

22             As an initial matter, I believe the Government would

23   like to exclude witnesses from the courtroom.  So I would ask

24   both of our witnesses to exit the courtroom at this time.

01:49:01  25             THE COURT:  That makes sense.

1       If you are a witness testifying in this matter, would

2  you please wait outside.

3       (Witnesses excluded from the courtroom.)

4       MR. PECHTEL:  The defense would propose that we do the

5  following for this hearing:  Initially, that we take appropriate

6  evidence, testimony from the witnesses; and then the defendant

7  would like to address the rebuttable presumption.  If the Court

8  rules that the rebuttable presumption has been overcome by the

9  defendant, then we can proceed to a second stage of argument

10 where the Government, as the party with the burden, argues for

11 detention; and then the defendant would then respond to the

12 Government's argument.

13      THE COURT:  Very well.  That makes sense.  Okay.

14      MR. PECHTEL:  I don't have any further initial remarks.

15 If the Government wants to make any initial remarks --

16      THE COURT:  Ms. Van Marter?

17      MS. VAN MARTER:  No, Your Honor.  That's fine with the

18 Government.

19      THE COURT:  Okay.  Then why don't we call the witnesses.

20      MR. PECHTEL:  The defense would call Lena Samorano.

21      (Witness approached.)

22      THE COURT:  Right over here.  That's okay.  Right over

23 here.

24      THE COURTROOM DEPUTY:  And before you get up to the

25 step, just turn and face me and raise your right hand.

1              LENA SAMORANO,

2    called as a witness on behalf of the Defendant, having first

3        sworn or affirmed, testified under oath as follows:

4              THE WITNESS:  I do.

01:50:47  5              THE COURTROOM DEPUTY:  Okay.  Have a seat.  There's a

6    step.  The chair does not roll -- you have to pull it -- so you

7    don't roll down the little step.  And make sure we're on here.

8              THE WITNESS:  I'm on camera, too.

9              THE COURTROOM DEPUTY:  That's just for her to see your

01:51:03 10   face because she can't turn.  And there's water for you.  And

11   when you're comfortable, please state your first and last name,

12   and spell them both for the record.

13             THE WITNESS:  Lena Samoran; L-E-N-A, S-A-M-O-R-A-N-O.

14             THE COURT:  Go ahead, Counsel.

01:51:16 15             MR. PECHTEL:  Thank you, Your Honor.

16

17                   DIRECT EXAMINATION

18   BY MR. PECHTEL:

19   Q    What city and state do you currently reside in?

01:51:22 20   A    Kennewick, Washington.

21   Q    And how long have you resided in the Tri-Cities area?

22   A    Approximately ten years.

23   Q    And do you recognize the defendant sitting at the table

24   over here?

01:51:33 25   A    Absolutely.

```
                   USA v. Pesina/4:19-cr-06063-SMJ-01          6
              Contested Motion Hearing/January 9, 2020
                       Samorano/D/Pechtel
```

1    Q    And who is that?

2    A    My best friend.

3    Q    What is her name?

4    A    Monica Angelic Pesina.

01:51:40   5    Q    Okay.  How long have you known Monica?

6    A    Fifteen years.

7    Q    You knew her when you weren't living in the Tri-Cities

8    area?

9    A    Um-hmm.

01:51:47   10   Q    Can you answer "yes" or "no" --

11   A    Yes.

12   Q    -- just for the court reporter?

13   A    Yes.  Sorry.

14   Q    What other locations did you know Monica from?

01:51:56   15   A    I met her at Pine Lodge.

16   Q    And where is Pine Lodge?

17   A    A women's correction center.

18   Q    Do you know if Monica has any children?

19   A    Three.

01:52:08   20   Q    And do you know of the approximate ages of those three

21   children?

22   A    22 or 23 -- I forget our older kids' age -- um, Angelic is

23   going to be 12 this year, so she's 11; and Biggie is 9 -- I

24   mean, oops, Joshua is 9.

01:52:30   25   Q    And have you helped Monica in raising the children?

1    A    They were with me for a month before she got picked up.

2    Q    And following her arrest, have you assisted with helping

3    the children attend appointments and various other things?

4    A    Since she's been picked up, they've been with their Aunt

01:52:57    5    Katie.

6    Q    Now, you do have a criminal history; is that correct?

7    A    Correct.

8    Q    And your most recent convictions are from when?

9    A    2015.  But apparently I didn't get convicted of my -- one

01:53:12    10    of them that I got charged with in 2015.  The last one would be

11    2017.

12    Q    So you were charged with two offenses in state court in

13    2015?

14    A    Um-hmm.

01:53:20    15    Q    And you pled guilty to both of those?

16    A    Yes.

17    Q    And you were sentenced in 2016 on one of them and 2017 on

18    the other one?

19    A    Yes.

01:53:30    20    Q    Let's also talk about -- you've struggled with drugs in the

21    past.

22         Is that fair to say?

23    A    Yes.

24    Q    Okay.  Can you explain to the judge when you say -- when I

01:53:41    25    said "struggle with drugs," what you meant when you agreed to

1    that statement?

2    A    Oh, yes.  Um, I've been an addict since I was approximately

3    12, and I started using meth when I was 15.  And, um, I've been

4    in and out of institutions since I was 15.  Um, and honestly, it

01:54:07  5    wasn't until -- I'm going to start crying -- it wasn't until the

6    last time I got in trouble and the judge told me that he had

7    faith in me to be the mom that I needed to be to my kids, and he

8    awarded me a program called FOSA, and it was the best thing that

9    ever happened to me, because this year I will celebrate four

01:54:35  10   years clean and sober and living a productive and being a

11   productive member of society.

12        Due to my addiction, I lost four of my children.  Um, one

13   child still does not talk to me.  Um, I don't have a

14   relationship with that child or that grandchild.  Um, but today

01:54:58  15   I have a strong relationship with my other -- all my other

16   children and with my oldest grandson.

17   Q    You indicated that the judge sentenced you to a program

18   called DOSA?

19   A    FOSA, Family Offender Sentencing Alternative.

01:55:15  20   Q    FOSA.  And what did that entail?

21   A    Um, that entailed -- it's kind of like you're in prison

22   outside of -- you know, you're kind of in prison at home.

23   You're not allowed to -- you have to write down -- basically you

24   can't have anybody at your home without your PO's, your

01:55:36  25   probation officer's permission; you have to let them know

1    anytime that you're leaving; um, they're allowed to stop by and

2    give you a UA at any given time.  Um, and it's that way for --

3    and you go and you have phases; Phase I, Phase II, and Phase

4    III.  And, um, once you phase out, you graduate the program and

01:55:59  5    you're done.

6    Q    Did you attend drug treatment during that period?

7    A    Yes.

8    Q    Where did you attend treatment at?

9    A    At First Steps.

01:56:06  10   Q    Okay.  And was that inpatient or outpatient?

11   A    Outpatient.

12   Q    How frequently did you go to outpatient treatment?

13   A    I started with IOP, which was three days a week; and then I

14   dropped down to OP, which was once a week.

01:56:21  15   Q    Did you find that helpful in remaining clean and sober?

16   A    Yes.

17   Q    What other things have you found helpful in achieving

18   sobriety over the past -- you mentioned it's going to be four

19   years this year.

01:56:34  20   A    I go to -- I go to church twice a week, and I go to

21   meetings; I have a sponsor; I work the steps.  And I, um --

22   every year I've -- except this last year; I got to go spend

23   Thanksgiving with my family in California, but usually I go

24   volunteer and I feed the homeless.

01:56:55  25   Q    Now I want to turn our attention back to Monica.

1      Do you know whether Monica struggles with drugs or alcohol?

2  A    Yes, she does.

3  Q    Can you describe to the judge what you know about her

4  struggles with using drugs or alcohol?

01:57:13   5  A    We have both -- we were -- we used together.  And in 2005,

6  we got locked back up together in 2005, um, and then she -- we

7  both started using again in 2012 together.

8  Q    And after you got -- well, what's your --

9  A    She was clean until 2012, from 2000 -- we got out of prison

01:57:51  10  in 2006 -- or '7, and she was clean from the time she got out

11  until 2012.

12  Q    And just, so we can talk about a specific date, what is

13  your clean date?

14  A    My clean date is July 27th, 2016.

01:58:05  15  Q    Okay.  Following that day, did you remain in contact with

16  Monica?

17  A    Well, yeah.  Of course.  I have -- I have her niece.  My

18  daughter is her blood niece.

19  Q    To your knowledge, after you got clean, did Monica continue

01:58:25  20  to use drugs?

21  A    There was a couple times I thought she was, but -- and, I

22  mean, of course she was, because we didn't have contact together

23  all the time.

24  Q    Now, you mentioned several tools that were at your disposal

01:58:42  25  that you used to help you get clean, including -- I think you

1    indicated you attend meetings and you have a sponsor and so on

2    and so forth.

3    A    Um-hmm.

4    Q    Did you find the support of other people who had gone

01:58:52    5    through similar experiences as you helpful in --

6    A    Absolutely.

7    Q    -- getting sober or clean?

8    A    Absolutely.

9    Q    And if the judge were to allow Monica to get released,

01:59:04    10   would you be supportive of her in trying to get clean?

11   A    Oh, absolutely.  It would be a prayer answered.

12   Q    What kinds of things would you encourage Monica to -- to do

13   and help her to do?

14   A    Outpatient treatment, go to church with me.

01:59:25    15   Q    And maybe -- maybe she would or maybe she wouldn't go to

16   church with you.  Would you introduce her to any of the

17   meetings --

18   A    I would take her to NA meetings.

19   Q    Okay.  In your opinion, do you think that Monica poses a

01:59:39    20   risk of danger to the public if she were to be released?

21   A    Absolutely not.

22   Q    And in your opinion, do you believe that Monica poses a

23   risk of fleeing and not showing up for court?

24   A    Absolutely not.  I know she'd show up for court.

01:59:53    25        MR. PECHTEL:  No further questions.

1          THE COURT:  Thank you.

2          Ms. Van Marter.

3

4                              CROSS-EXAMINATION

01:59:58  5   BY MS. VAN MARTER:

6   Q    Good afternoon.

7   A    Hi.

8   Q    Congratulations --

9   A    Thanks.

02:00:04 10   Q    -- on upcoming four years of sobriety.

11   A    Thanks.

12   Q    I just have a series of questions for you.

13          You had indicated the most -- at least talking just about

14   your most recent criminal history, where you were convicted, I

02:00:18 15   believe, 2016 and 2017 --

16   A    Um-hmm.

17   Q    -- what types of offenses were those?

18   A    I think they were the theft charges.

19   Q    Could they also have been related to the delivery,

02:00:30 20   manufacture of methamphetamine?

21   A    Unless that's when they closed my case.  Because they

22   didn't close my -- my case wasn't closed until I graduated in

23   2017.  So maybe that's the one you're talking about.

24   Q    Were you arrested for --

02:00:46 25   A    No, I was never arrested again.

1    Q    Let me just -- I just -- for that previous offense, were

2    you at one point arrested for the manufacture and distribution

3    of methamphetamine?

4    A    I was arrested in 2015.  I don't recall getting arrested

02:00:59    5    after that.

6    Q    Okay.  But that was for the offense of manufacture and

7    distribution --

8    A    Um-hmm.

9    Q    -- of methamphetamine?

02:01:05    10    A    Yeah.

11    Q    Approximately how much methamphetamine?

12    A    Um, they -- it was like a quarter ounce.  It was just a

13    little bit.

14    Q    And that was during the time that you had indicated that

02:01:15    15    you were still spending time with Ms. Pesina?

16    A    Um-hmm.

17    Q    And you two had relapsed together?

18    A    In 2012.

19    Q    When you were still using from 2012 until 2015 --

02:01:26    20    A    Um-hmm.

21    Q    -- at the time of your arrest?

22    A    Um-hmm.

23    Q    And were you still seeing Ms. Pesina and using with

24    Ms. Pesina during that time period?

02:01:33    25    A    Yeah.

1    Q    And your drug of choice was what?

2    A    Meth.

3    Q    And what was Ms. Pesina's at the time?

4    A    Meth.

02:01:40  5    Q    Methamphetamine?

6    A    Um-hmm.

7    Q    And your history with Ms. Pesina, you said you've known

8    each other for 15 years; is that right?

9    A    Um-hmm.

02:01:47  10   Q    Did that relationship begin or involve, in the beginning,

11   drug use?

12   A    Nope.

13   Q    When did you begin using drugs with Ms. Pesina?

14   A    Um, not until after -- one -- one of our releases out of

02:02:01  15   prison.

16   Q    Okay.  I think you had said that you had relapsed or had

17   began --

18   A    In 2005.

19   Q    -- in 2005 with her.

02:02:09  20   A    Um-hmm.

21   Q    And then you both went and served some time together?

22   A    Yeah.  We met in prison.

23   Q    Okay.  So you were using prior to going to prison?  When

24   did you meet in prison, what year?

02:02:18  25   A    2004.

1    Q    2004.

2         And when were you released that year?

3    A    2005.  She had already -- she was already there, and I got

4    there and met her.

02:02:27   5    Q    Okay.

6    A    We were released in 2005.

7    Q    Okay.

8    A    Got out, and we were out for a little bit, and then we both

9    went back.

02:02:35   10   Q    Did you get arrested at the same time in 2005 or '6?

11   A    No.  A month apart.

12   Q    Okay.  And were those arrests also drug-related?

13   A    Yes, I think so.

14   Q    What -- what offense?

02:02:47   15   A    Mine was my DOSA was revoked.

16   Q    Okay.  And was that based upon violations, not completing

17   treatment --

18   A    Um-hmm.

19   Q    -- or using again?

02:02:56   20   A    Um-hmm.

21   Q    Okay.  And during that time, you also said Ms. Pesina was

22   also using and sent back to prison as well?

23   A    Yep.

24   Q    And when were you guys released, the two --

02:03:05   25   A    2007.

1    Q    2007.

2         Around the same time period?

3    A    Um, a month -- a month apart maybe?  Maybe two months

4    apart.

02:03:15    5    Q    Okay.  And you had said that you believe Ms. Pesina was

6    then clean from 2007 to 2012; is that correct?

7    A    Yes, she was.

8    Q    Were you clean between 2007 and 2012?

9    A    No.

02:03:26    10    Q    And were you then --

11    A    I was -- I got clean -- I was clean from 2007 to 2010 --

12    no, 2009.  And then, um, when I relapsed, she quit talking to

13    me, and she stayed clean and lived her life.  And then we

14    relapsed -- we didn't relapse together.  We relapsed around the

02:03:49    15    same time in 2012.  But she had stayed clean until 2012; from

16    2007 to 2012, yes.

17    Q    And you have a familial relationship through -- as -- were

18    you involved with one of her brothers?

19    A    Um-hmm.

02:04:02    20    Q    And that -- obviously she has two brothers, right?

21    A    Yeah.

22    Q    Which brother?

23    A    Troy.

24    Q    So is that the one -- and where is Troy now?

02:04:10    25    A    He's in jail.

1   Q    For what offense?

2   A    I don't know.  I don't talk to him.  I haven't talked to

3   him in a long time.

4   Q    Okay.  It's a federal offense?

02:04:17   5   A    No, I don't think so.

6   Q    Did --

7   A    I don't know.  Honestly, I don't know.  I don't talk to

8   him.

9   Q    Okay.  Might have been related to the *Henrikson* case, a

02:04:27  10   homicide that occurred on the South Hill?

11   A    I don't know --

12       MR. PECHTEL:  Objection, Your Honor.  The witness has

13   indicated she has no knowledge about this --

14   A    I don't know what --

02:04:36  15       MR. PECHTEL:  -- topic.

16       THE COURT:  Hold on, everybody.  Sustain the objection.

17       Go ahead.

18   BY MS. VAN MARTER:  (Continuing)

19   Q    During the time that you were involved with Troy Pesina and

02:04:42  20   Monica Pesina, was he also involved with drugs?

21   A    Actually, no.

22   Q    Was Troy Pesina a drug user at all?

23   A    He is -- yes, he is.  But him and I, our relationship was

24   never about drugs.  I don't think it lasted more than three

02:05:00  25   months.  So ...

1    Q    Okay.

2    A    I think I got pregnant the day he got out of jail, prison.

3    Q    So in 2012 when you and Ms. Pesina found each other both in

4    a relapse situation, do you know why Ms. Pesina relapsed after

02:05:16    5    four years of sobriety?

6    A    Um-hmm.

7    Q    And does it have to do with a personal stress in her life?

8    A    Probably.

9    Q    Okay.

02:05:24    10    A    Her boyfriend, the father of her children, she found him

11    talking to other women, and it was just too much for her.

12    Q    And is it your experience, especially when you have a

13    long-time history with somebody and a friendship with somebody,

14    if there are stressors, that that can create a stressor on both

02:05:45    15    of you in terms of a risk of relapse?

16    A    Say that again.

17    Q    So you have a long-time friendship with Ms. Pesina.

18    A    Yeah.

19    Q    You've both relapsed together around the same periods of

02:05:55    20    time, correct?

21    A    Yes.

22    Q    Based upon different life stressors that are going on; is

23    that correct?

24    A    I don't think my relapse was -- I -- honestly, my relapse

02:06:05    25    was never because of a life stressor.  I had an amazing life.  I

1   relapsed because I wanted to; um, because I'm an addict.  And I

2   think hers was she just couldn't -- honestly, I think that hers

3   was more stress-induced.  I mean, she gave a man her whole life

4   and gave him two kids, and then to find out that he's cheating,

02:06:32   5   I think it stressed her out a lot.  Her life was falling apart

6   underneath her feet.  I mean, she was doing -- they were doing

7   really well.

8   Q    And have you ever known Ms. Pesina to face such substantial

9   drug charges in her history?

02:06:49   10   A    No.

11   Q    And fair to say that these types of charges are stressful?

12   A    Nothing that I don't think she can't, uh, control, or -- or

13   find, you know, um, adequate support to get her through it.

14   Q    You had testified that just prior to her being picked up,

02:07:15   15   you had the children or were helping to take care of her

16   children; is that correct?

17   A    Yeah.

18   Q    Which -- at which point did you have them, which arrest,

19   prior to which arrest, the arrest in June, the arrest in

02:07:29   20   September, or the arrest in November?

21   A    The arrest in September, when they were at the -- they got

22   arrested in the black, um, vehicle.

23   Q    So when did you first get the kids, then, prior to that

24   arrest?

02:07:43   25   A    I got them that day that she got arrested.  They surrounded

1    her car.  She had picked up my son from school and was going to

2    bring my son and her daughter to my house --

3    Q    I thought --

4    A    -- because --

02:07:54  5    Q    Excuse me, ma'am.  I thought you testified that you had the

6    children a month prior to her -- from when she was picked up.

7    A    That was about a month prior to this pickup.

8    Q    To this pickup.

9    A    Yeah.

02:08:02  10    Q    Okay.  That's what I was just trying to clarify.

11          So you had the children from September until November, the

12    most recent arrest?

13    A    Yes.

14    Q    And why did you have the children during that time period?

02:08:14  15    A    Because she got picked up in September, and then I went and

16    got the kids, and then I just kept them.

17    Q    But she bonded out within 24 hours; is that correct?

18    A    Um-hmm.

19    Q    And why did you keep them after that?

02:08:25  20    A    Because she had court dates and stuff coming up that she

21    was having to go to in Spokane.

22    Q    Did you know where she went?

23    A    What do you mean, do I know where she went?

24    Q    When she was released, do you know where she went to stay?

02:08:37  25    A    At first, she went to stay at her house.  She -- they let

*USA v. Pesina/4:19-cr-06063-SMJ-01*                    21
*Contested Motion Hearing/January 9, 2020*
*Samorano/X/Van Marter*

1    her out to come down here.

2    Q    But you kept the kids, even after she went back to her --

3    A    Yeah, because she was going to have to be having to

4    trans -- go to court dates.  She was having to check in, and,

02:08:52   5    um, she was going to have to go to court, so I just told her I'd

6    keep the kids until she got it all -- until she got it all done.

7    Q    Okay.  When were you aware that she was no longer living at

8    that residence?

9    A    Um, I'm not sure, really.

02:09:12  10    Q    Was -- did you know if she was aware there were other

11   arrest warrants coming for her?

12   A    No, we never -- none of us knew, because otherwise she

13   would have turned herself in or called at least, because she had

14   court in Spokane, and she only showed up for that -- I know

02:09:28  15   about her showing up for court because she would come over to my

16   house.  She'd come over to my house a couple times.

17   Q    So what court dates did she have to go to for Spokane?

18   A    Well, they picked her up for -- when they pulled her over

19   and picked her up and did a search warrant on her house.

02:09:42  20   Q    Do you know when those court dates were?

21   A    No, I'm not sure of dates.  They're not my court dates.

22   Q    Did you go with her for those court dates?

23   A    No.

24   Q    And when did -- I'm sorry.  When did you find out that she

02:09:54  25   was no longer living at her house in Richland then?

|         |    |   |                                                         |
|---------|----|---|---------------------------------------------------------|
|         | 1  | A | I'm not sure.                                           |
|         | 2  | Q | Do you know where she went after that?                  |
|         | 3  | A | No.                                                     |
|         | 4  | Q | You still had her kids?                                 |
| 02:10:06 | 5  | A | Yeah, I still had her kids.                            |
|         | 6  | Q | Was she in communication with her children?            |
|         | 7  | A | Yes.                                                    |
|         | 8  | Q | But you --                                              |
|         | 9  | A | On the -- mostly by phone.                              |
| 02:10:13 | 10 | Q | But you didn't know where she went?                    |
|         | 11 | A | I -- we don't know where she was staying.               |
|         | 12 | Q | Do you know if she was even in the same city?           |
|         | 13 | A | Not sure.                                               |
|         | 14 | Q | Do you know who Mr. Carter is?                           |
| 02:10:23 | 15 | A | Yes.                                                   |
|         | 16 | Q | Who is Mr. Carter?                                       |
|         | 17 | A | Her boyfriend.                                          |
|         | 18 | Q | And how long has she been with Mr. Carter?              |
|         | 19 | A | I'm not sure.                                           |
| 02:10:32 | 20 | Q | Do you know if Mr. Carter struggles with drugs?        |
|         | 21 |   | THE WITNESS:  Is this even -- does this matter?         |
|         | 22 |   | THE COURT:  You need to answer her questions.           |
|         | 23 | A | Um, yes, I'm -- yes, I guess.  I don't know.  I know that's |
|         | 24 |   | what he got picked up on, but I don't really know him like that. |
|         | 25 |   |                                                         |

1    BY MS. VAN MARTER:    (Continuing)

2    Q    Okay.  And do you know if she was with Mr. Carter during

3    this time period when you had her children?

4    A    I'm pretty sure she was.

02:10:54 5    Q    But you don't know where they were staying?

6    A    No.

7    Q    And do you know why they left the area?

8    A    No.

9    Q    Have you ever --

02:11:04 10    A    We --

11    Q    Have you ever had occasion --

12    A    I'm not even sure that they left the area.

13    Q    Have you ever had occasion to take possession of her kids

14    before?

02:11:14 15    A    Have I ever had to take possession of her kids?

16    Q    Had occasion to take possession of her kids before?

17    A    Say --

18    Q    Have you ever had -- have you ever been in charge of her

19    kids before that time period?

02:11:24 20    A    No.

21    Q    Where did the kids typically stay?

22    A    With her.

23    Q    Do they also stay or would they also stay with the aunt,

24    where they are now?

02:11:32 25    A    They would spend weekends there, I know that, because my

1    kids have gone over there with them on the weekends.

2    Q    And after her arrest in November in Dixie, Washington, who

3    came and got the kids?

4    A    They were with Katie.

02:12:04    5    Q    They were already with Katie?

6    A    Um-hmm.

7    Q    And who is Katie?

8    A    Their aunt.

9    Q    Okay.  And that's the same aunt that we previously referred

02:12:12    10    to, just for the record?

11    A    Yes.

12    Q    Okay.  And when did the aunt come get the kids?

13    A    On Halloween.  Actually, they went to their aunt's house on

14    Halloween -- no.  Actually, they went to their aunt's house

02:12:26    15    on -- I'm trying to think of what day Halloween was on.

16    Q    You can just give an estimate.

17    A    It was on a weekend, because they went to their aunt's

18    house on a Monday, I want to say, or Sunday -- the Sunday after

19    Halloween is when they went to their aunt's house.

02:12:47    20    Q    Okay.  And why did the aunt come get the kids at that

21    point?

22    A    Because she's their blood aunt and I am not.

23    Q    My question:  Was there an arrangement made between

24    Ms. Pesina and her aunt that she would come get the children?

02:13:00    25    A    Yes.

1   Q    And that was a communication that you were not a part of?

2   A    Yes, I was.

3   Q    Okay.  And --

4   A    I mean, I knew that she was going to come get the kids,

02:13:10   5   yes, absolutely.

6   Q    And why is it that the kids were not going to stay with

7   you?

8   A    Because I couldn't financially take care of them, and she

9   can.  And, um, she's their blood aunt, and she can make legal --

02:13:20   10   you know, she can make decisions.  I already have three children

11   of my own.

12   Q    And you indicated that you obviously continue with several

13   different aftercare options, to include church and community

14   involvement; is that correct?

02:13:34   15   A    Yes.

16   Q    Are you also employed?

17   A    Right -- right this second?

18   Q    Yes.

19   A    No.

02:13:40   20   Q    Okay.

21   A    I do side -- I do side jobs cleaning houses.

22   Q    Okay.  And you also attend some aftercare meetings as well?

23   A    Um-hmm.

24   Q    Okay.  And currently, right now, would you consider

02:13:54   25   Ms. Pesina in need of drug treatment?

1    A    Yes.

2    Q    To assist her in trying to maintain --

3    A    I think that she -- I think outpatient would do her an

4    amazing job, would be amazing.  She would do amazing in it.

02:14:09    5    Q    Do you know how many times she's attended drug treatment in

6    the past?

7    A    I'm pretty sure just one time.

8    Q    It could be more?

9    A    I'm pretty sure it's just one.

02:14:19    10    Q    Okay.  Did you attend the same treatment with her --

11    A    No.

12    Q    -- at the same time?

13    A    No, we didn't attend it at the same time.

14    Q    And do you know -- and obviously -- was that -- do you know

02:14:29    15    what time period that was, where she attended treatment

16    previously?

17    A    I'm pretty sure when she released from Tri-Cities work

18    release she was doing treatment.  That's when.

19    Q    Do you know what year that was?

02:14:41    20    A    2007.

21    Q    Okay.  And right -- during the time right before she had

22    her stretch of sobriety?

23    A    She -- yeah, she had -- yeah.

24        MS. VAN MARTER:  Okay.  If I could just have a moment,

02:14:53    25    Your Honor.

1      (Counsel conferring.)

2           MS. VAN MARTER:  I don't have any other questions, Your

3      Honor.  Thank you.

4           THE COURT:  Any other questions, Counsel?

02:15:13   5           MR. PECHTEL:  Just a few, Your Honor.

6

7                          REDIRECT EXAMINATION

8      BY MR. PECHTEL:

9      Q    Ms. Samorano, do you have any reason to believe that Monica

02:15:20  10      has lived outside the state of Washington at any time?

11      A    She's never been outside of Washington.

12      Q    Lived outside the state of Washington?

13      A    She's never lived outside the state of Washington, I

14      don't -- nope, she never has.

02:15:32  15      Q    Has she ever discussed international travel with you?

16      A    No.

17      Q    To your knowledge, does she have a passport?

18      A    No.

19      Q    We've indicated --

02:15:42  20      A    Sorry.

21      Q    -- or you've mentioned that her children are living with

22      her aunt.

23           Do you know where her aunt resides?

24      A    Yes.

02:15:48  25      Q    And where is that?

1    A    Um, in Finley.

2    Q    Here in the Tri-Cities area?

3    A    Yes.  And her son lives in the Seattle area, her older son

4    and her grandchild.

02:16:01    5    Q    Have you ever known Monica to be violent?

6    A    No.

7    Q    Okay.  Have you ever seen her have a firearm?

8    A    Never.

9    Q    Ever seen her with a tactical knife, like a switchblade or

02:16:16    10    something like that?

11    A    No.

12    Q    Okay.

13    A    She's the most soft-spoken person you'll ever meet in your

14    life.

02:16:27    15        MR. PECHTEL:  No further questions.

16        THE COURT:  Any additional questions, Ms. Van Marter?

17        MS. VAN MARTER:  No, Your Honor.

18        THE COURT:  May this witness be excused?

19        MR. PECHTEL:  She may, Your Honor.

02:16:34    20        THE COURT:  Ms. Van Marter?

21        MS. VAN MARTER:  Yes, Your Honor.

22        THE COURT:  All right.  Thank you very much.  You're

23    excused.

24        THE WITNESS:  Thank you.

02:16:49    25        THE COURT:  Any additional witnesses, Counsel?

1    MR. PECHTEL:  One more, Your Honor.  We would call

2  Deeann Goorich.  Excuse me.  It's Goodrich, not Goorich.  I

3  misspelled it on the paper.

4    THE COURT:  Counsel, I'm not going to correct a single

02:17:09  5  person about mispronunciation.

6    (Witness approached.)

7    THE COURT:  Right up here.

8    THE COURTROOM DEPUTY:  Hi.  If you'll just go to the

9  corner right there and turn and face me and raise your right

02:17:34  10  hand.

11

12                          DEEANN GOODRICH,

13   called as a witness on behalf of the Defendant, having first

14      sworn or affirmed, testified under oath as follows:

02:17:41  15    THE WITNESS:  Yes.

16    THE COURTROOM DEPUTY:  Okay.  Please have a seat.

17    The chair does not roll; you'll have to pull it in.  And

18  then speak directly into the mic.  There's water.  And when

19  you're comfortable, please state your first and last name, and

02:17:57  20  spell them both for the record.

21    THE WITNESS:  My name is Deeann Goodrich.  It's spelled

22  D-E-E-A-N-N; Goodrich, G-O-O-D-R-I-C-H.

23

24

25

1                       DIRECT EXAMINATION

2    BY MR. PECHTEL:

3    Q    Good afternoon, Mrs. Goodrich -- Ms. Goodrich.  Thank you

4    for joining us.

02:18:11   5         Can you let the judge know what city and state you reside

6    in?

7    A    Um, in Kennewick, Washington.

8    Q    And we're here about the matter about Monica Pesina.

9         Do you personally know Monica Pesina?

02:18:23  10  A    Um, I personally don't.

11   Q    Okay.

12   A    Um, my boss did interview her; Jason Bliss has interviewed

13   her and, um, did an intake on her.

14        THE COURT:  Jason who?  I'm sorry?

02:18:35  15        THE WITNESS:  Bliss.

16        THE COURT:  Bliss.  Thank you.

17   BY MR. PECHTEL:  (Continuing)

18   Q    But you've never personally met her before?

19   A    No.

02:18:40  20  Q    What is your association with the Oxford House system?

21   A    I am the Oxford House housing navigator slash outreach

22   worker for Benton/Franklin counties.

23   Q    What does that require you to do?

24   A    I currently am funding -- doing housing funding for both

02:18:59  25  Benton and Franklin Counties to help people like Mrs. Pesina get

1   into housing.

2   Q    And how many hours a week does that occupy of your time?

3   A    Uh, roughly 32.

4   Q    And you're employed by the Oxford House --

02:19:12  5   A    Yes.

6   Q    -- system?

7        How long have you been doing that?

8   A    Um, I just recently hired, but I've been involved with

9   Oxford for about five years.

02:19:19  10  Q    Okay.  Are you familiar with the history of the Oxford

11  House system?

12  A    I am.

13  Q    When did it originate?

14  A    Um, 1975.  Yeah.

02:19:28  15  Q    And what are Oxford Houses?

16  A    Oxford Houses are self-sufficient, self-supporting recovery

17  houses.  Um, in these houses, these people are required to do

18  random UAs.  It is an open-door policy, but we do have a, uh --

19  I believe it's a 97 percent if you stay, you're most likely to

02:19:50  20  stay clean.

21  Q    Do you have other individuals who are pending trials --

22  A    I do.

23  Q    -- residing in Oxford Houses?

24  A    I do.  I have several in different houses, and several who

02:20:01  25  have come and stayed and then went and did -- followed through.

1    Q    Now, in Ms. Pesina's case, have you determined whether

2    there is -- one of the Oxford Houses has availability for her to

3    reside there if she were to be released?

4    A    If she was to be released, I do have an address, a bed, and

02:20:20  5    a source of funding waiting for her.

6    Q    And how long would it take for that to come into effect, if

7    she were released?  Would it be same day?

8    A    Yeah, same day.

9    Q    What kinds of things, besides random UAs, is Ms. Pesina

02:20:42  10    required to do if she is going to stay in an Oxford House?

11    A    She's required to attend mandatory house meetings.  Our

12    houses are ran democratically, so every person has a voice in

13    that house.  She's required to go to three NA or self-help

14    meetings a week.  Um, she's required to just be a part of the

02:21:00  15    house and hold herself accountable long as -- as well as her

16    roommates.

17    Q    If she was not in compliance with those requirements, what

18    would happen?

19    A    Um, she would not be in compliance -- well, okay, I'm going

02:21:12  20    to be honest with you:  It depends on what "not compliant" it

21    is.  If it's disruptive behavior, then we would personally

22    remove her from the house and put her in another house.  If she

23    was to pass a dirty UA, then she -- we would probably make

24    contact with the right people.

02:21:29  25    Q    And when you say "the right people," you would contact the

1    supervising probation officer?

2    A    Yes.  Yeah, her PO, her parole officer.

3    Q    And if that was something that the judge required, you guys

4    would not have a problem doing that?

02:21:43    5    A    No, not at all.

6    Q    And if she weren't to attend the required self-help

7    meetings three times a week, what would happen?

8    A    Um, she would go on what we call a 30-day contract, and

9    what that means is she has 30 days to rectify the behavior.

02:21:56    10    Q    And if she doesn't rectify it, what happens?

11    A    Then she will probably lose her bed, and we would have to

12    contact her parole officer.

13    Q    You mentioned 97 percent success rate?

14    A    We do.

02:22:09    15    Q    Okay.  And when you quote that number, what are you

16    referring to specifically?

17    A    Um, we have -- well, all the houses nationwide.  So it's a

18    statistic that we had done, that 97 percent of people who move

19    into Oxford and stay for a year are sober for the remainder of

02:22:27    20    the time.

21    Q    So we're talking about a shorter period of time before

22    Ms. Pesina goes to trial.

23         Are you aware of any statistics for a shorter period of

24    time --

02:22:36    25    A    I don't.  I don't know.

1   Q    So the best information that you have is if you're in

2   Oxford for a year --

3   A    For a year, then you're most likely, yeah.

4   Q    -- 97 percent likely to --

02:22:43  5   A    Yeah.

6   Q    -- remain sober?

7   A    Yeah.

8        MR. PECHTEL:  No further questions.  Thank you.

9        THE WITNESS:  Yep.

02:22:53  10       THE COURT:  Any additional questions?

11

12                    CROSS-EXAMINATION

13   BY MS. VAN MARTER:

14   Q    Good afternoon, Ms. Goodrich.

02:22:58  15       You said that you've been involved with the Oxford House

16   here in Kennewick for the last five years?

17   A    In both counties.

18   Q    In both counties.

19        And what types of positions have you held with the Oxford

02:23:07  20   House?

21   A    Um, I personally myself lived in an Oxford House for

22   11 months.  I've held state positions as alumni coordinator;

23   I've held all the chapter positions as pres -- all -- most of

24   those I've helped in; and now, like I said, I'm staff.

02:23:24  25   Q    And so you're familiar, then, with the inner workings of

1    the Oxford House not only from a managerial but from a personal

2    experience?

3    A     Yes.

4    Q     Are the Oxford Houses -- you mention a lot about self --

02:23:38   5    self-regulation, self-policing.

6          So is it really designed to be left up to the individual

7    who is at the Oxford House to make sure that they participate

8    and get the most out of the experience at Oxford House?

9    A     Ultimately it is up to the person to want it.  But Oxford

02:23:58   10   House is group living, so our roommates are there to encourage

11   us to do better for ourselves also.

12   Q     And at Oxford Houses there -- there is no security; is that

13   correct?

14   A     There's not.  It's an open-door policy.

02:24:09   15   Q     And so individuals can come and go, and there's no

16   regulation or checking in or stopping them --

17   A     So they're only allowed three days out a week.  Um, and

18   there is curfews, and each house is different on curfew times on

19   that.

02:24:26   20         Um, if and when she is accepted, she will go on a 30-day

21   blackout, which will have no visitors, nothing to that effect

22   for the first 30 days.

23   Q     But she is still free to walk out the door if she --

24   A     She is still free to walk out.

02:24:42   25   Q     And I know that you work with a lot of individuals who are

1   in both pre and post --

2   A   Yeah.

3   Q   -- conviction status with the courts.  Is that correct?

4   A   We do.

02:24:50  5   Q   Okay.  And this is a circumstance, obviously, of

6   preconviction or -- or preresolution of the case, so you'll be

7   working with United States Probation.

8   A   Right.

9   Q   Have you worked with United States Probation in the past?

02:25:02  10   A   We have.  Jason Bliss has, yeah.

11   Q   Jason has?  I'm sorry?

12   A   Oxford House as a whole has, I guess is the answer, yeah.

13   Q   Okay.  And you had indicated that there are circumstances

14   where you report information to Probation; is that correct?

02:25:15  15   A   Yes.

16   Q   What kinds of circumstances do you report?

17   A   Um, so like I said, UAs.  Um, if she was not to come home

18   or check in, that would be something that we would have to

19   report; or changing of houses, because sometimes personalities

02:25:30  20   just don't click in houses so we change houses.  So things like

21   that do have to be reported to the parole officer.

22   Q   And what happens if drugs are introduced into the Oxford

23   House?

24   A   Um, she's got to go.  I mean --

02:25:45  25   Q   Are the police called?

1    A    Yes.

2    Q    Okay.  Are they allowed to search --

3    A    They can.

4    Q    -- for the presence of narcotics?

02:25:51    5    A    Yep.

6    Q    And you were asked a lot about some success rates.  There

7    are some good success rates for people who chose to stay for a

8    period of time --

9    A    Right.

02:26:01    10    Q    -- correct?

11        Obviously there are struggles for individuals who do not

12    choose to stay for the longevity of the Oxford House; is that

13    true?

14    A    True.

02:26:10    15    Q    And do you frequently come across individuals who are

16    nonparticipant or violative of the rules of the Oxford House?

17    A    Yeah.  I mean, it's -- yeah, you're going to find somebody

18    who doesn't want it.

19    Q    And I was just going to say, is that predominately because

02:26:22    20    that person either does not want to or is not ready to accept --

21    A    To accept --

22    Q    -- sobriety?

23    A    Yeah.

24    Q    And have you had occasion to work with individuals who are

02:26:31    25    released and potentially facing substantial sentences?

1    A    Yes.

2    Q    And is that considered to be an additional stressor that's

3    addressed within the Oxford House community?

4    A    It's not, because we believe that everybody has a right to

02:26:43    5    sobriety.

6    Q    No, I'm sorry.  I think you misunderstood my question.

7         Is the possibility of facing jail time, is that a common

8    stressor that people have in trying to address their sobriety,

9    an outside stressor?

02:26:57    10    A    Yeah.

11    Q    As well as family stresses?  All those outside stresses can

12    impact one's sobriety; is that correct?

13    A    Sobriety, yep.

14    Q    And Oxford House is designed to have a group setting to

02:27:10    15    address those?

16    A    Yep.

17    Q    And the UAs, do you guys send the UAs off to the lab?

18    A    We have instant ones.  But if something was to happen, we

19    do have accessible to send in.

02:27:25    20    Q    Does that include detecting for the presence of fentanyl?

21    A    Yes.

22    Q    And are you guys able to do that on regular basis?  I know

23    there's a --

24    A    Yes, our InstaCups actually do that.

02:27:35    25    Q    Okay.  And is that determined by the intake and

1    self-reporting of the individual as to which controlled

2    substances you will test for?

3    A    I don't understand.

4    Q    So when individuals come in for intake --

02:27:45    5    A    Um-hmm.

6    Q    -- they obviously self-disclose which particular drug of

7    choice or issue they may have.

8    A    Right.

9    Q    Is that correct?

02:27:52    10    A    Yes.

11    Q    And then they're ordered to produce UAs?

12    A    Right.

13    Q    Who determines which -- is it run for the whole panel --

14    A    It's a 16-panel UA.  So they're ran for the whole 16

02:28:04    15    panels.

16    Q    And that includes fentanyl?

17    A    Yep.

18          MS. VAN MARTER:  I don't have any other questions, Your

19    Honor.

02:28:09    20          THE COURT:  Any additional questions?

21          MR. PECHTEL:  I just have a small series of questions

22    that I forgot to ask earlier.

23

24

25

                          REDIRECT EXAMINATION

1   BY MR. PECHTEL:

2   Q     So Ms. Pesina has several children.

3         Does the Oxford House system allow children to reside with

4   their parents, in certain circumstances?

5   A     Yes.  The house she is going into, she will be able to have

6   her children with her at that time.

7   Q     Living full time with her?

8   A     Yep, if that's an option.

9         MR. PECHTEL:  No further questions.

10        THE WITNESS:  Yep.

11        THE COURT:  Any additional questions?

12        MS. VAN MARTER:  No, Your Honor.

13        THE COURT:  May this witness be excused?

14        MR. PECHTEL:  Yes, Your Honor.

15        MS. VAN MARTER:  That's fine, Your Honor.

16        THE COURT:  Thank you very much for your testimony.

17        Any additional witnesses?

18        MR. PECHTEL:  Not from the defense, Your Honor.

19        THE COURT:  Okay.  Any witnesses from the Government?

20        MS. VAN MARTER:  Your Honor, I guess I -- I think the

21   way that Mr. Pechtel was trying to break down in terms of the

22   presumption, we had already proffered information which the

23   Court accepted and incorporated into her order.

24        THE COURT:  Correct.

1    MS. VAN MARTER:  So if the -- having not done a

2    detention appeal before Your Honor, we do have a witness

3    available, but it was not our intention to present substantive

4    evidence at this time, unless there's additional information

02:29:26    5    that should arise from the argument.

6    THE COURT:  No, there isn't.  Thank you.

7    MS. VAN MARTER:  Thank you.

8    THE COURT:  You know, I -- one of the issues, of course,

9    is whether or not there is a rebuttable presumption.  Again,

02:29:42    10    this is a case in which the defendant faces a mandatory minimum

11    sentence of ten years, so I guess there would -- that requires

12    the defendant to produce that information to establish that

13    rebuttable presumption.

14    And here I guess I would hear from you, Mr. Pechtel, if

02:30:09    15    you would argue that point.

16    MR. PECHTEL:  Thank you, Your Honor.

17    I'm sure the Court has had full opportunity to review

18    the briefing that's been filed.  I would just point the Court to

19    our analysis in our reply on Pages 3 and 4.  The rebuttable

02:30:36    20    presumption in drug trafficking cases, Congress enacted that law

21    because there were several factors that were common in large

22    drug trafficking cases:  Specifically, drug traffickers were

23    engaged in a business of drug trafficking, which increased their

24    risk of pretrial recidivism of continuing that business; and,

02:30:58    25    second, that large-scale drug traffickers often had the

1    financial resources and international connections in order to

2    flee the country.  And sources for those congressional findings

3    are cited on Page 3 of our reply.

4            In this case, neither of those factors are at play.

02:31:20   5    First of all, there's no indication that Ms. Pesina is connected

6    to any sort of international organization, has ever traveled

7    outside the country, has a passport, or has any sort of

8    international connections.  Second, there's no evidence before

9    the Court that she is independently wealthy or has any sort of

02:31:39   10   financial resources that would easily allow her to flee the

11   country.

12           Second [sic], although it's alleged in this case that

13   she was engaged in a pattern of drug trafficking, assuming,

14   arguendo, that that can be established, we would proffer to the

02:31:56   15   Court that over the course of two months of her incarceration,

16   any business that she may have had would have substantially

17   deteriorated because addicts need their drugs, and they would

18   have found alternative sources of supply in the intervening

19   period.

02:32:14   20           Second, the need for -- the financial need to engage in

21   drug trafficking is replaced by the prospects of employment.

22   And we provided the Court with a letter from an employment

23   agency, and I can't recall -- Compass Career Solutions, which is

24   Exhibit A to our reply, indicating that Ms. Pesina qualifies for

02:32:41   25   services through their agency, and that they'll be able to get

1   her full-time employment.

2           In addition to that, her financial resources in order to

3   get started when she's on the outside, her brother is willing to

4   help her get back on her feet, which was indicated in the

02:32:57   5   Pretrial Services report.

6           So the two fundamental considerations that Congress had

7   in creating the rebuttable presumption aren't really present in

8   this case.

9           In addition to that, there are a number of factors that

02:33:10   10   indicate that her risk of recidivism on pretrial release is

11   relatively low, and that she would appear for court as directed

12   by the Court.  Those factors were listed in -- on Page 5 of our

13   original motion, and they include things such as the fact that

14   she is a citizen of this country, and she has lived in southern

02:33:39   15   Washington her entire life; she's traveled outside the state on

16   very rare occasions and lacks a passport; her two minor children

17   currently reside in the Tri-Cities area, so if she were to flee

18   the jurisdiction, she would be abandoning her family, become a

19   fugitive, and essentially give up any ongoing relationship she

02:33:58   20   might ever have with her children again; she -- she does not

21   have a history of failing to appear for court, at least I'm not

22   aware of any proffer from the Government that she has.  She

23   didn't flee Washington after the June 2019 traffic stop or the

24   September arrest.  She has no history of violence, and she has

02:34:20   25   no history of firearm violations.

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

1          One of the things that the Government indicates in their

2     proffers in their response is that there were firearms found

3     co-located with Ms. Pesina over the course of some of these

4     arrests.  But I would note for the Court that the one firearm

02:34:37  5     located in the June arrest, this incident, the charged incident,

6     was found on the person of Nick Carter, not just loose in the

7     car.  The October arrest involved him alone possessing a

8     firearm.  Ms. Pesina isn't even related to that incident, at

9     least the police reports don't indicate that she was involved at

02:34:56  10    all.  And so there's no indication that she possessed firearms.

11    And we heard testimony from Ms. Samorano that she has never seen

12    Monica possess firearms or other dangerous weapons.

13         All of this is buttressed by the fact that she is an

14    addict and was addicted during the relevant period to -- and

02:35:17  15    using drugs heavily, which clouded her judgment.  Obviously over

16    the past two months she's been incarcerated and has not been

17    using narcotics, and her ability to rationally make decisions

18    has improved as a result of that.

19         THE COURT:  I anticipate, Counsel, one of their

02:35:37  20    arguments is going to be that month period of time where she

21    was -- they would argue, I presume, that she was gone, and she

22    knew that, they would argue, that the Government was intending

23    to look for her.

24         MR. PECHTEL:  Yes, Your Honor, I see that proffered in

02:35:57  25    the Government's briefing.  From reviewing the discovery, all I

1    could find is that a confidential source, an unknown source

2    indicated to law enforcement that that might be the case, and

3    that's the sole basis for their factual assertion.  I don't have

4    any knowledge of who that source is, what their credibility is,

02:36:14    5    or what specifically they told law enforcement or what the

6    factual basis they had for making that representation to law

7    enforcement was.  It could have been pure speculation on the --

8    on the confidential source's part, given the circumstances.  And

9    so we just have really no basis to give any weight to that

02:36:34    10    proffer, Your Honor, without having the confidential source come

11    testify as to why he or she knew that that had occurred.  And

12    just the fact that she left the area doesn't corroborate the

13    idea that --

14              THE COURT:  Well, part of it, though, Counsel, is the

02:36:52    15    fact that she left the area.

16              Isn't the argument that not only that, but that she left

17    her children in the care of somebody else and had only phone

18    contact with them?  Isn't that concerning?

19              MR. PECHTEL:  I don't think so, Your Honor, given the

02:37:13    20    fact that my client is an addict, and when an addict goes on a

21    spree, it's very reasonable for them to leave their children.

22    And I can think from my personal background of instances, not me

23    personally but people that I know, where if an addict or an

24    alcoholic goes on a spree, that they leave their children with

02:37:36    25    somebody else to take care of the children so that they're free

1    to do whatever they feel like doing.  So I don't see that

2    necessarily corroborative of the intentional fleeing from the

3    jurisdiction or -- you know, if she were -- if she was aware of

4    a federal arrest warrant, you would think that maybe she would

02:38:00    5    flee a little bit further or stop the trafficking of drugs, not

6    just relocate 80 miles to the east and continue to traffic

7    drugs.  It just doesn't make a lot of sense.  If that's -- her

8    intention is to not get caught, it just -- I don't follow the

9    logic there, I guess, Your Honor.

02:38:21    10            So just -- just to wrap up, she has a plan to address

11    the addiction concerns, which includes living in a stable group

12    housing situation where there will be incredible accountability

13    from her peers, along with the peer support from her best friend

14    Lena, who has been clean and sober for the past three years.

02:38:41    15    Obviously there's a condition of release that she not

16    communicate with felons, but we would ask that that requirement

17    be lifted specifically with respect to Lena because we think

18    that her contact with Lena would be far more beneficial than

19    detrimental, given the fact that Ms. Samorano has been clean and

02:39:04    20    sober for the past three years and has been through this process

21    and knows what it takes to get -- to get clean.

22            And so for those reasons, we feel that we've met our

23    minimal obligation, as was quoted in our reply, minimal

24    obligation to produce some evidence to indicate that the

02:39:23    25    presumption should be overcome.  And the case law indicates that

1    if the presumption is overcome, it doesn't fall away; the Court

2    can still consider those factors in rendering an ultimate

3    decision.  But we believe that we've overcome the presumption,

4    and then the burden then shifts back to the Government to prove

02:39:41    5    by clear and convincing evidence or a preponderance of the

6    evidence one of the two relevant statutory tests, whether she

7    would appear for court or be a danger to the public.

8         So for those reasons, we would ask that you find that

9    the presumption has been overcome in this case, and we can

02:39:55   10    proceed to argument on the underlying detention issue.

11         Thank you.

12         THE COURT:  Go ahead.

13         MS. VAN MARTER:  Thank you, Your Honor.

14         Respectfully, the United States' position is that --

02:40:12   15    that Judge Magistrate Dimke was presented with the same series

16    of facts and arguments as presented to this Court.  I know this

17    Court has the ability for a *de novo* review, but I would argue,

18    even with the supplemental information provided, it actually

19    just gives greater weight to what Judge Dimke's findings

02:40:29   20    previously were and concerns that Ms. Pesina has not overcome

21    the presumption of detention in this matter.

22         I think that some of the most important information

23    before the Court as we talk about recidivism and, therefore,

24    risk to the community, risk of non-supervisability, in this case

02:40:49   25    we can only look to the defendant's own actions.  We don't have

 1    to speculate.  We don't have to look to statistics.  And in this

 2    particular case, the defendant has not only repetitively been

 3    arrested and intervened by law enforcement under serious

 4    circumstances but, arguably, the conduct has escalated by not

02:41:10  5    only type and quantity of narcotic, but the inclusion of

 6    fentanyl-laced pills.

 7            And I understand defendant's attempt to parse out

 8    arguments that the guns may be in the possession of her

 9    boyfriend, but the boyfriend who is engaged in drug trafficking

02:41:27  10    with her sitting right next to her or living with her during

 11    each occasion.

 12            There is one occasion where he was by himself, after

 13    they had bonded out from the September incident in Spokane.  But

 14    the other two occasions, where there were distribution

02:41:41  15    quantities of a multitude of controlled substances, large

 16    amounts of U.S. currency, scales, and other indicia of

 17    distribution, multiple cell phones, Ms. Pesina was right with

 18    him.

 19            The concern of the United States is raised by this

02:41:55  20    Court, and I think somewhat enhanced by, certainly, the good

 21    intentions of her friend.  After the arrest in September, which

 22    was a Spokane investigation that led them to multiple

 23    residences, to include a residence here in Richland, and the

 24    location of numerous amounts of evidence as located -- as noted

02:42:16  25    by the Government in its proffer, previously by Judge Dimke in

1    her findings, and again in our response, they bonded out quickly

2    and left the area.  It is still another town, an association

3    with an individual that was not part of the other ongoing

4    investigations, which makes it difficult for law enforcement,

02:42:34    5    who had obtained arrest warrants for both of them at that point

6    in time and had been actively looking for them at all of their

7    normal locations, to include the residence that she supposedly

8    returned to upon bonding, and they were not there.

9            It does further corroborate the source's information

02:42:50   10    that she was fleeing the area when, in fact, she did leave the

11    area; did not tell her friend, who had her children, where she

12    was at; and the friend then believes that she's doing so to

13    attend court in Spokane, which did not exist at the time.

14           All of those factors seem to corroborate the fact that

02:43:10   15    she simply left the area, knowing she'd just been caught over

16    the last two months with large quantities of narcotics and

17    firearms, knowing that more arrest warrants were coming.

18           And it is even more concerning, and should be concerning

19    to this Court, that even in spite of that, whether she was

02:43:27   20    actively using drugs or not, they were in possession of large

21    quantities of methamphetamine, heroin, fentanyl-laced pills, and

22    loaded firearms.

23           All of those factors combined, there is -- in the United

24    States' respectful opinion, there is no way that she can

02:43:45   25    overcome the presumption of detention, not only to the

1   dangerousness, but also the risk of flight.  And the risk of

2   flight is not dependent upon access of cash, although there is

3   evidence that there were quantities of cash seized from her

4   during each of the occasions, and it is also not dependent upon

02:44:01   5   evidence of international travel.  It is the risk of the

6   continuous behavior, risk to the public, based upon the totality

7   of the behavior and the escalation of that behavior.

8          It is also of concern to the United States that the

9   proposed release is going to be dependent upon Ms. Pesina to

02:44:23  10   actually receive the treatment.  And I would direct the Court to

11   the previous Pretrial Services reports and reports of family

12   members who have known Ms. Pesina throughout the years of

13   struggle, even in the history that is recounted by her best

14   friend, when times of stress, even stress just involving an

02:44:41  15   intimate relationship, not just facing a ten-year mandatory

16   minimum sentence, has caused Ms. Pesina to relapse, and to

17   relapse in such a way that has led her back to prison on drug

18   charges; and in this case, facing more substantial drug charges

19   based upon evidence of drug trafficking behavior.

02:45:00  20          It is also of concern that in such short turnaround she

21   was able to obtain those types of supplies repetitively, even

22   after being arrested by law enforcement and released.

23          So, given the totality of circumstances, we do not

24   believe that Ms. Pesina can overcome that presumption.

02:45:17  25          THE COURT:  All right.  Thank you.

1    MS. VAN MARTER:  Thank you.

2    THE COURT:  Anything else, Mr. Pechtel?

3    (Counsel conferring.)

4    MR. PECHTEL:  A moment, Your Honor.

02:45:24    5    THE COURT:  Sure.

6    (Counsel and defendant conferring.)

7    MR. PECHTEL:  Just a few clarifications, Your Honor.

8    First of all, Ms. Pesina did not bond out of the Spokane

9    case.  She was released on her personal recognizance.

02:45:50    10    THE COURT:  Okay.

11    MR. PECHTEL:  And I did provide a citation to a website,

12    which the Court can look at, and it indicates that the

13    prosecutor declined to file charges in that case within the week

14    following her arrest.  So there was no active case in -- going

02:46:03    15    on in Spokane.

16    The other issue that the Government raised that I

17    thought I should at least respond to is this issue that

18    Ms. Pesina should be held accountable for the actions of her

19    associate, Nick Carter.  If she were to be released by the

02:46:19    20    Court, obviously Mr. Carter is detained at the moment, and

21    unless something changes, he would continue to be detained, and

22    so any risk that she would reassociate with him is obviously

23    nonexistent so long as he is detained pending the trial in this

24    case.

02:46:37    25    And then lastly, this is something that I've run across,

1    having done several of these detention hearings in front of the

2    magistrate court:  I think that we are starting to conflate the

3    issue of the presumption of detention with the ultimate question

4    of whether there's clear and convincing evidence of

5    dangerousness --

6              THE COURT:  And I'm trying not to do that, Counsel, but

7    there has to be some evidence to establish -- right? -- that --

8    and to overcome that presumption, and that evidence you've

9    presented in the form of the testimony today by Ms. Samorano and

10   the information from Ms. Goodrich.  But that's still a

11   requirement, though.  And I'm not -- I'm having trouble with

12   that.

13             MR. PECHTEL:  Your Honor, I would just -- I would argue

14   to the Court that it's a minimal obligation.  I cited the Third

15   Circuit case that says it's a minimal -- it's a burden of

16   production.  It's not -- we don't even have to establish by a

17   preponderance of the evidence that she doesn't pose these risks.

18   We just have to produce the evidence that, absent contrary

19   evidence from the Government, the Court can look at that

20   evidence and say prima facie that's sufficient to overcome the

21   presumption.  That's what I understand the burden of production

22   to be, is that the Court looks at what the defendant presents

23   without contrary evidence being presented by the Government.

24   But perhaps that's my misunderstanding of what a burden of

25   production is.

1    In any case --

2    THE COURT:  Let me hear from the Government on that

3    point.

4    MS. VAN MARTER:  Your Honor, the production by the

5    defense is not in a vacuum of all the facts and circumstances

6    which support detention.  So in the presumption of detention,

7    the presumption is invoked based upon the nature of the charges.

8    The United States then can present to the Court what the nature

9    of the charges are, in addition to the fact that it evokes the

10   mandatory minimum offense.

11   THE COURT:  Right.

12   MS. VAN MARTER:  They then have the burden of production

13   to rebut the nature of offense which invokes the presumption.

14   So our argument here is although they presented

15   information, the nature of that information presented does not

16   rebut directly the nature of the offense which presumes the

17   detention so much so to overcome.

18   And I think the Court is correct; in the separation of

19   the facts, it's difficult because part and parcel of that is the

20   nature of the offense itself.

21   THE COURT:  Right.

22   MS. VAN MARTER:  And so I don't think it's -- and just

23   because he presents some evidence, that doesn't kick it to the

24   second inquiry, in the United States' argument.

25   THE COURT:  Okay.  Mr. Pechtel, I stopped you as you

1    were moving on to a second point, so ...

2         MR. PECHTEL:  I think I made the points I wanted to

3    make, Your Honor.

4         THE COURT:  Okay.  The Court finds that there is a

02:49:38   5    rebuttable presumption under 18 U.S.C. Section 3142(e)(3)

6    because the defendant has indicated -- excuse me -- because the

7    defendant was indicted for an offense with a maximum sentence of

8    imprisonment of ten years or more under the Controlled Substance

9    Act.

02:50:01   10        Frankly, I don't find that the defense has produced

11    sufficient evidence to rebut that presumption.  The Government

12    has shown -- in addition, the Government has shown by clear and

13    convincing evidence that there is no set of conditions or

14    combination of conditions of release that will reasonably assure

02:50:21   15    the safety of any of other persons in the community, and has

16    shown by a preponderance of the evidence that no condition or

17    combination of conditions of release will reasonably assure the

18    defendant's appearance as required.  As such, the motion will be

19    denied.

02:50:40   20        I will note that of special concern, frankly, was that

21    time in between that -- that month-long time, as testified by

22    Ms. Samorano, where the defendant was not providing the

23    information where she was at and she had left her children with

24    an individual.  I find that very concerning, and not indicative

02:51:12   25    of someone who would return to a court hearing or -- frankly,

1    would flee.  So the Court is going to deny the motion.

2         Counsel, I'm not sure when we're set for pretrial, but

3    I'm sure we'll -- maybe you all know.

4         MS. VAN MARTER:  I'm not sure.

02:51:40    5         Are we in -- and just to let the Court know, I

6    anticipate that there will be another indictment presented with

7    respect to Ms. Pesina; I didn't want any of the parties or the

8    Court to be surprised.  Hopefully that will get taken care of

9    prior to that next pretrial conference.

02:51:56    10         THE COURT:  Very well.

11         Anything else we need to address today?

12         MR. PECHTEL:  Not from the defense, Your Honor.

13         THE COURT:  All right.  Thank you for your

14    presentations, and that will conclude this matter.  Thank you.

02:52:08    15         THE COURTROOM DEPUTY:  Please rise.

16         Court is adjourned.

17         (Hearing concluded at 2:52 p.m.)

18

19

20

21

22

23

24

25

56

1          C E R T I F I C A T E

2

3      I, KIMBERLY J. ALLEN, do hereby certify:

4          That I am an Official Court Reporter for the United

5   States District Court for the Eastern District of Washington in

6   Richland, Washington;

7          That the foregoing proceedings were taken on the date

8   and at the time and place as shown on the first page hereto; and

9          That the foregoing proceedings are a full, true and

10  accurate transcription of the requested proceedings, duly

11  transcribed by me or under my direction.

12         I do further certify that I am not a relative of,

13  employee of, or counsel for any of said parties, or otherwise

14  interested in the event of said proceedings.

15         DATED this 26th day of February, 2020.

16

17

18

19  _____

20  Kimberly J. Allen, CRR, RMR, RPR, CCR(WA)
    Washington CCR No. 2758
21  Official Court Reporter
    Richland, Washington
22

23

24

25

KIMBERLY J. ALLEN, CRR, RPR, CSR
OFFICIAL COURT REPORTER